# Exhibit A

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| ROBBINS ARROYO LLP<br>BRIAN J. ROBBINS (190264)<br>600 B Street, Suite 1900<br>San Diego, CA 92101 | **Electronically Filed<br>by Superior Court of CA,<br>County of Santa Clara,<br>on 11/2/2018 11:48 AM<br>Reviewed By: R. Walker<br>Case #18CV337109<br>Envelope: 2130985** |

TELEPHONE NO.: (619) 525-3990    FAX NO.: (619) 525-3991
ATTORNEY FOR *(Name):* Plaintiff Inter-Local Pension Fund GCC/IBT

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Santa Clara
STREET ADDRESS: 191 North First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME: Downtown Superior Court

CASE NAME:
Inter-Local Pension Fund GCC/IBT v. Tesla, Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER |
|---|---|---|---|---|
| ☑ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | **18CV337109** |
| | | | JUDGE: | |
| | | | DEPT: | |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☑ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☑ is    ☐ is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☑ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☑ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☐ punitive
4. Number of causes of action *(specify):* 3
5. This case ☑ is    ☐ is not    a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: November 2, 2018
Brian J. Robbins
_____
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courtinfo.ca.gov* |

E-FILED
11/2/2018 11:48 AM
Clerk of Court
Superior Court of CA,
County of Santa Clara
18CV337109
Reviewed By: R. Walker

ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
STEPHEN J. ODDO (174828)
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
    soddo@robbinsarroyo.com

Attorneys for Plaintiff

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| INTER-LOCAL PENSION FUND GCC/IBT, Individually and on Behalf of All Others Similarly Situated, | Case No. **18CV337109** |
| Plaintiff, | CLASS ACTION |
| v. | COMPLAINT FOR VIOLATIONS OF CALIFORNIA LAW AND THE SECURITIES ACT OF 1933 |
| TESLA, INC., ELON MUSK, GOLDMAN SACHS & COMPANY, LLC, MORGAN STANLEY & COMPANY, LLC, BARCLAYS CAPITAL, INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INC., CITIGROUP GLOBAL MARKETS, INC., DEUTSCHE BANK SECURITIES, INC., RBC CAPITAL MARKETS, LLC, and DOES 1-25, Inclusive, | |
| Defendants. | DEMAND FOR JURY TRIAL |

**INTRODUCTION**

1. Plaintiff Inter-Local Pension Fund GCC/IBT ("Plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Tesla, Inc. ("Tesla" or the "Company") as well as media and analyst reports about the Company and Company press releases.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

**SUMMARY OF THE ACTION**

2. Plaintiff brings this class action on behalf of purchasers of Tesla's 5.3% Senior Notes due 2025 (the "Notes").  Pursuant to a materially misleading offering circular dated August 11, 2017 (the "Offering Circular"), Tesla issued and sold $1.8 billion worth of the Notes (the "Offering").  The Offering closed on or about August 18, 2017.

3. This action asserts strict liability claims under sections 12 and 15 of the Securities Act of 1933 ("1933 Act") and negligent violations of California Corporations Code § 25401 against Tesla, its Chief Executive Officer ("CEO"), Elon Musk ("Musk"), Goldman Sachs & Co. LLC ("Goldman Sachs"), Morgan Stanley & Co. LLC ("Morgan Stanley"), Barclays Capital Inc. ("Barclays"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Citigroup Global Markets Inc. ("Citigroup"), Deutsche Bank Securities Inc. ("Deutsche Bank"), and RBC Capital Markets, LLC ("RBC Capital") [1] (collectively, the "Defendants").

4. The Offering Circular contained misleading statements regarding the production of Tesla's Model 3 line of vehicles.  In particular, the Offering Circular claimed that Tesla would be able to quickly scale its production of the Model 3 to 5,000 vehicles per week by the end of 2017 and 10,000 vehicles per week by the end of 2018 with the help of its Gigafactory 1.  Ability to mass

---

[1] Goldman Sachs, Morgan Stanley, Barclays, Merrill Lynch, Citigroup, Deutsche Bank, and RBC Capital, are collectively referred to herein as the "Underwriter Defendants".

produce the Model 3 line of cars was and is vital to the success of the Company.  Tesla has poured billions of dollars into mass producing the Model 3, as it is the only way that the Company can achieve profitability.

5.      Just two months after the issuance of the Notes, the Company admitted that it would be unable to make 5,000 vehicles per week by 2017.  Further, as first reported by *The Wall Street Journal*, rather than using the high tech assembly line described in the Offering Circular, Tesla was still making a significant portion of the Model 3s by hand.  Since that time, Tesla has continually moved back when it will be able to consistently produce 5,000 Model 3s per week.  In addition, the Company has since admitted that its battery factory, the "Gigafactory 1," did not have the ability to make the batteries in the needed amounts for the Model 3 throughout 2017, and still did not as of February 2018.

6.      Defendants are responsible for the false and misleading statements and omitted material facts made in connection with the Offering.  Defendants authorized the Offering Circular or participated in making the false and misleading statements.   The Underwriter Defendants orchestrated and conducted the Offering.  Section 12(a)(2) of the 1933 Act and Cal. Corp. Code § 25501 provides buyers of securities an express remedy for material misstatements or omissions made by any seller or solicitor in connection with the offer or sale of the issuer's securities involving a prospectus or oral communications. Such remedies include, but are not limited to, rescission of the sale of the Notes.  Section 25504 renders Defendants joint and severally liable for controlling those Defendants that made the direct sale of the Notes.

## **JURISDICTION AND VENUE**

7.      The claims alleged herein arise under sections 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l (a)(2) and 77o.  Jurisdiction is conferred by section 22 of the 1933 Act and venue is proper pursuant to section 22 of the 1933 Act.  This action is not removable under section 22 of the 1933 Act, which explicitly states that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court in the United States." *See Cyan Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1065 (2018).

This Court has original subject matter jurisdiction under the California Constitution, Article VI, section 10 and section 22 of the 1933 Act, 15 U.S.C. §77v.

8.      This Court has personal jurisdiction under California Code of Civil Procedure section 410.10 because certain Defendants are located in this District, including Tesla, and Defendants and their agents affirmatively solicited the subject Notes and Offering Circular to investors in California and those contacts with California have a substantial connection to the claims alleged herein.

9.      Both Tesla and defendant Musk are citizens of California.

10.     This Court is the proper venue under California Code of Civil Procedure section 395(a).

**THE PARTIES**

11.     Plaintiff purchased the Notes pursuant to the Offering Circular directly from underwriting defendant Goldman Sachs.

12.     Defendant Tesla is a Delaware corporation with principal executive offices located at 3500 Deer Creek Road, Palo Alto, California. Tesla designs, develops, manufactures and sells fully electric vehicles and energy storage products and has established its own global network of vehicle sales and service centers and supercharger stations[2].  The Company currently produces and sells three fully electric vehicles: the Model S, Model X, and the Model 3.

13.     Defendant Musk is Tesla's CEO and was since October 2008, and Chairman of the Board and was since April 2004.  Musk is also Tesla's largest stockholder, owning approximately 22% of its stock.  Tesla claims on its website that Musk is a co-founder of the Company.  It also states that Musk oversees "all product design, engineering and manufacturing of the company's electric vehicles, battery products, and Solar Roofs."

14.     Defendant Goldman Sachs is a New York limited liability company with principal executive offices located at 200 West Street, New York, New York.  Goldman Sachs served as

---

[2] A supercharger station provides Tesla owners with extremely-fast battery pack swaps as well as fast-recharge for Tesla Model S and Model X vehicles.

1  underwriter to Tesla in connection with the Offering.   Goldman Sachs sold Notes directly to
2  plaintiff.

3      15.      Defendant Morgan Stanley is a Delaware limited liability company with principal
4  executive offices located at 1585 Broadway, New York, New York.  Morgan Stanley served as an
5  underwriter to Tesla in connection with the Offering.

6      16.      Defendant Barclays is a Connecticut corporation with principal executive offices
7  located at 745 7th Avenue, New York, New York.   Barclays served as an underwriter to Tesla in
8  connection with the Offering.

9      17.      Defendant Merrill Lynch is a Delaware corporation with principal executive offices
10  located at One Bryant Park, New York, New York. Merrill Lynch served as an underwriter to Tesla
11  in connection with the Offering.

12      18.      Defendant Citigroup is a New York corporation with principal executive offices
13  located at 388 Greenwich Street, New York, New York.  Citigroup served as an underwriter to Tesla
14  in connection with the Offering.

15      19.      Defendant Deutsche Bank is a Delaware corporation with principal executive offices
16  located at 60 Wall Street, New York, New York.  Deutsche Bank served as an underwriter to Tesla
17  in connection with the Offering.

18      20.      Defendant RBC Capital is a Minnesota limited liability company with principal
19  executive offices located at 200 Vesey Street, 5th Floor, New York, New York.  RBC Capital served
20  as an underwriter to Tesla in connection with the Offering.

21      21.      Except as described herein, plaintiff is ignorant of the true names of defendants sued
22  as Does 1–25, inclusive, under California Code of Civil Procedure section 474 and, therefore,
23  plaintiff sues these defendants by such fictitious names.   Following further investigation and
24  discovery, plaintiff will seek leave of this Court to amend this Complaint to allege their true names
25  and capacities when ascertained.  These fictitiously named defendants are Tesla's officers, other
26  members of management, employees, and/or consultants or third parties who were involved in the
27  wrongdoing detailed herein.  These defendants aided and abetted, and participated with and/or
28  conspired with the named defendants in the wrongful acts and course of conduct or otherwise caused

the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences, and events alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action pursuant to section 382 of the California Code of Civil Procedure on behalf of a class consisting of all persons or entities who purchased the Notes, pursuant to the Offering Circular issued in connection with the Offering (the "Class"). Excluded from the Class are defendants and their families, the officers, directors, and affiliates of the defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

23.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

24.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal securities law that is complained of herein.

25.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

26.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated federal securities laws;

(b)     whether Defendants violated California securities laws;

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA LAW AND SECURITIES ACT OF 1933

(c)      whether statements made by the defendants in the Offering Circular contained materially false and misleading statements, or misrepresented or omitted material facts about the Company's business operations; and

(d)      the proper measure of damages.

27.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**THE FALSE AND MISLEADING OFFERING CIRCULAR**

28.      Tesla is attempting to be the first successful new U.S. based car company in over a century.  It is doing this by selling only completely electric cars.  Tesla's first 3 vehicles (the Tesla Roadster, the Model S, and the Model X) were all geared to the high-end vehicle market.  The Company, however, could not profitably produce these vehicles.  Rather, the Company's success depends on its ability to produce its mass market vehicle, the Model 3.  Underscoring its importance, in 2017, the Company spent $4 billion on attempting to mass produce the Model 3.

29.      The Company is taking an aggressive approach by mass producing the Model 3 and the electric batteries used to power it all in-house.  Tesla is making the Model 3 vehicles at its Freemont, California factory.   Its batteries are being made at the Company's Gigafactory 1 located outside of Reno, Nevada.  While this gives Tesla more control, it also means that any problems or delays in either factory can slow or stall the entire Model 3 production.

30.      On or about August 7, 2017, the Defendants issued the preliminary offering circular detailing that Tesla planned on issuing $1.5 billion worth of notes.  On or about August 11, 2017, the Defendants issued the Offering Circular, increasing the amount of Notes to $1.8 billion.   The Defendants completed the Offering on or about August 18, 2017.  The planned use of the proceeds of the Offering was to "strengthen [Tesla's] balance sheet during this period of rapid scaling with the launch of the Model 3 and for general corporate purposes."

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA LAW AND SECURITIES ACT OF 1933

31.     The Offering Circular talked at length about the Model 3 and the Gigafactory 1.  In particular, in its description of the Company, the Offering Circular stated, "We are ramping to volume production and deliveries of Model 3, and are planning to produce 5,000 Model 3 vehicles per week by the end of 2017, and 10,000 Model 3 vehicles per week at some point in 2018."

32.     Regarding Gigafactory 1, the Offering Circular stated, "Gigafactory 1 is designed to supply enough batteries to support the annual production of over 500,000 vehicles at our Fremont Factory as well as our energy storage product line."

33.     Discussing the interplay between the Model 3 and Gigafactory 1, the Offering Circular stated, "[the] Model 3 was designed for volume manufacturing, with a streamlined design and reduced complexity. Gigafactory 1, where we are producing lithium-ion battery cells and drive units for Model 3, has been designed to support our projected volume ramp of Model 3 production."

34.     As stated above, mass producing the Model 3 was fundamental to the Company's ability to turn a profit.  Concerning ramping up production of the Model 3, the Offering Circular Stated:

> **Clear path to scale**. Building upon the experience, infrastructure and brand recognition we have already established with Model S and Model X, *we started production and completed our first customer deliveries of Model 3 in July 2017. Model 3's streamlined design and manufacturing process enables increased automation and a significant reduction in materials costs compared to the Model S and Model X*. Model 3 currently has fewer than 100 initial configurations and a modular body with no variations, compared to more than 1,500 configurations and 80 body variations in Model S. *Our new body shop enables us to reduce Model 3 total labor content significantly through the use of over 1,000 robots in a highly dense layout. We believe these process and design improvements will allow us to ramp Model 3 production significantly faster than our prior vehicles to fulfill the larger addressable market for this vehicle*. As capacity utilization improves, Model 3 gross margin is expected to improve rapidly in 2018 to our target of 25%.

35.     The statements above were false and misleading because the Company lacked the ability to scale Model 3 production, especially up to 5,000 vehicles a week in 2017 at the time the Offering Circular was issued.  The Company had significant supply chain and production problems at both the Model 3 manufacturing plant and "Gigafactory 1."  Both the Model 3s and the batteries needed to run those vehicles were still being built by hand at their respective facilities, instead of the automation needed to mass produce the car described in the Offering Circular.  In fact, workers at

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA LAW AND SECURITIES ACT OF 1933

Tesla's Model 3 production facility could not even build enough of the vehicles to carry out necessary testing.  Meanwhile, the Gigafactory 1 needed to have the Company disassemble a production line that was in Germany, ship it to the United States, and reassemble it in Nevada before it could produce the necessary amount of batteries.

36.     The Offering Circular described certain "risks" related to Tesla, including that there could be delays in the Company's production timeline, as a result of, among other items, delays in the Company's ability to add production lines and capacity.  In particular, the Offering Circular stated:

> We have experienced in the past, and may experience in the future, significant delays or other complications in the design, manufacture, launch and production ramp of new vehicles and other products such as our energy storage products and the Solar Roof, which could harm our brand, business, prospects, financial condition and operating results.

>                                    *   *   *

> We have experienced in the past launch, manufacturing and production ramp delays or other complications in connection with new vehicle models such as Model S and Model X, and new vehicle features such as the all-wheel drive dual motor drivetrain on Model S and the second version of autopilot hardware. For example, at times since the launch of Model X, we encountered unanticipated challenges, such as certain supply chain constraints, that forced us to decrease the production of these vehicles from our initial expectations. If unexpected issues arise or recur with respect to any of our production vehicles, we may experience further delays. In addition, because our vehicle models share certain production facilities with other models, the volume or efficiency of production with respect to one model may impact the production of other models.

>                                    *   *   *

> We may also experience similar delays or other complications in bringing to market and ramping production of new vehicles, such as ramping Model 3 on production manufacturing lines, and other products such as our energy storage products and the Solar Roof. Any significant additional delay or other complication in the production of our current products or the development, manufacture, launch and production ramp of our future products, including complications associated with expanding our production capacity, supply chain or regulatory approvals, could materially damage our brand, business, prospects, financial condition and operating results.

>                                    *   *   *

- 8 -

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA LAW AND SECURITIES ACT OF 1933

We may experience delays in realizing our projected timelines and cost and volume targets for the production, launch and ramp of our Model 3 vehicle, which could harm our business, prospects, financial condition and operating results.

* * *

Our future business depends in large part on our ability to execute on our plans to manufacture, market and sell the Model 3 vehicle, which we intend to offer at a lower price point and to produce at significantly higher volumes than our present production capabilities for the Model S or Model X vehicles. We commenced production and initial customer deliveries of Model 3 in July 2017 and have announced our goal to increase Model 3 vehicle production to 5,000 vehicles per week by the end of 2017 and 10,000 vehicles per week at some point in 2018.

* * *

We have no experience to date in manufacturing vehicles at the high volumes that we anticipate for Model 3, and to be successful, we will need to complete the implementation and ramp of efficient, automated and low-cost manufacturing capabilities, processes and supply chains necessary to support such volumes. Moreover, our Model 3 production plan has required and will require significant investments of cash and management resources.

Our production plan for Model 3 is based on many key assumptions, including:

• that we will be able to complete implementing and ramping a new dedicated final assembly line for high volume production of Model 3 at the Tesla Factory without exceeding our projected costs and on our projected timeline;

• that we will be able to continue to expand Gigafactory 1 in a timely manner to produce high volumes of quality lithium-ion cells to be integrated into finished battery packs and drive unit components for Model 3, all at costs that allow us to sell Model 3 at our target gross margins;

• that the equipment and processes which we have selected for Model 3 production will be able to accurately manufacture high volumes of Model 3 vehicles within specified design tolerances and with high quality;

• that we will be able to maintain suppliers for the necessary components on terms and conditions that are acceptable to us and that we will be able to obtain components on a timely basis and in the necessary quantities to support high volume production; and

• that we will be able to attract, recruit, hire, train and retain skilled employees, including employees on the production line, to operate our planned high volume production facilities to support Model 3, including at the Tesla Factory and Gigafactory 1.

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA LAW AND SECURITIES ACT OF 1933

If one or more of the foregoing assumptions turns out to be incorrect, our ability to meet our Model 3 projections on time and at volumes and prices that are profitable, the number of current and future Model 3 reservations, as well as our business, prospects, operating results and financial condition, may be materially and adversely impacted.

* * *

We may be unable to meet our growing vehicle production and delivery plans, both of which could harm our business and prospects.

Our plans call for significant increases in vehicle production and deliveries to high volumes in a short amount of time. Our ability to achieve these plans will depend upon a number of factors, including our ability to add production lines and capacity as planned while maintaining our desired quality levels and optimize design and production changes, and our suppliers' ability to support our needs. In addition, we have used and may use in the future a number of new manufacturing technologies, techniques and processes for our vehicles, which we must successfully introduce and scale for high volume production. For example, we have introduced aluminum spot welding systems and high-speed blow forming of certain difficult to stamp vehicle parts. We have also introduced unique design features in our vehicles with different manufacturing challenges, such as large display screens, dual motor drivetrain, autopilot hardware and falcon-wing doors. We have limited experience developing, manufacturing, selling and servicing, and allocating our available resources among, multiple products simultaneously. If we are unable to realize our plans, our brand, business, prospects, financial condition and operating results could be materially damaged.

Concurrent with the significant planned increase in our vehicle production levels, we will also need to continue to significantly increase deliveries of our vehicles. Although we have a plan for delivering a significantly increased volumes of vehicles, we have limited experience in delivering a high volume of vehicles, and no experience in delivering vehicles at the significantly higher volumes we anticipate for Model 3, and we may face difficulties meeting our delivery and growth plans into both existing markets as well as new markets into which we expand. If we are unable to ramp up to meet our delivery goals globally, this could have a material adverse effect on our business, prospects, financial condition and operating results.

* * *

Future problems or delays in expanding Gigafactory 1 or ramping operations there could negatively affect the production and profitability of our products, such as Model 3.

To lower the cost of cell production and produce cells in high volume, we are integrating the production of lithium-ion cells and finished battery packs for the Model 3 and energy storage products at Gigafactory 1. While Gigafactory 1 began producing lithium-ion cells for energy storage products in January 2017 and has

- 10 -

since begun producing lithium-ion cells for Model 3, we have no other direct experience in the production of lithium-ion cells. Given the size and complexity of this undertaking, it is possible that future events could result in the cost of expanding and operating Gigafactory 1 exceeding our current expectations and Gigafactory 1 taking longer to ramp production and expand than we currently anticipate. In order to reach our planned volume and gross margin for Model 3, we must have significant cell production from Gigafactory 1, which, among other things, requires Panasonic to successfully ramp its all-new cell production lines to significant volumes over a short period of time. Although Panasonic has a long track record of producing high-quality cells at significant volume at its factories in Japan, it has never before started and ramped cell production at a factory in the U.S. like at Gigafactory 1. We are now in the early stages of production and have experienced the types of challenges that typically come with a production ramp. We expect that we will continue to experience challenges as we move through the ramp, and we will continue to fine-tune our manufacturing lines to address them. While we currently believe that we will reach our production targets, if we are unable to resolve ramping challenges and expand Gigafactory 1 production in a timely manner and at reasonable prices, and if we or Panasonic are unable to attract, hire and retain a substantial number of highly skilled personnel, our ability to supply battery packs to our vehicles, especially Model 3, and other products could be negatively impacted. Any such problems or delays with Gigafactory 1 could negatively affect our brand and harm our business, prospects, financial condition and operating results.

\* \* \*

If we fail to scale our business operations and otherwise manage future growth effectively as we rapidly grow our company, especially internationally, we may not be able to produce, market, sell and service our products successfully.

Any failure to manage our growth effectively could materially and adversely affect our business, prospects, operating results and financial condition. We continue to expand our operations significantly, especially internationally, including by a planned transition to high volume vehicle production and the worldwide sales and servicing of a significantly higher number of vehicles than our current vehicle fleet in the coming years, with the ramp of Model 3. Furthermore, we are developing and growing our energy storage product and solar business worldwide, including in countries where we have limited or no previous operating experience in connection with our vehicle business. Our future operating results depend to a large extent on our ability to manage our expansion and growth successfully. We may not be successful in undertaking this global expansion if we are unable to control expenses and avoid cost overruns and other unexpected operating costs; establish sufficient worldwide sales, service and Supercharger facilities in a timely manner; adapt our products and conduct our operations to meet local requirements; implement the required infrastructure, systems and processes; and find and hire a significant number of additional manufacturing, engineering, service, electrical installation, construction and administrative personnel.

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA LAW AND SECURITIES ACT OF 1933

37.     The truth was, however, that these risks had already come to fruition, as the Company's production goal of 5,000 vehicles per week by the end of 2017 was impossible to meet, and the Gigafactory 1 had no ability to meet the growing need for its batteries.  The Defendants were required to disclose this material information.  First, SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), requires disclosure of any known events or uncertainties that, at the time of the Offering, had caused, or were reasonably likely to cause, a materially negative impact on Tesla.  The severe yet undisclosed production problems of the Model 3, as well as the consequential negative impact on the Company's revenues, net profits, and customer retention, were likely to (and in fact did) materially and adversely affect Tesla.

38.     Second, SEC Regulation S-K, 17 C.F.R. §229.503 ("Item 503"), required in the "Risk Factor" section of the Offering Circular, a discussion of the most significant factors that made the offering risky or speculative and that each risk factor adequately described the risk.  Defendants' failure to disclose the already occurring production delays, as well as the likely material effects it would have on the Company's share price and value of the Notes, rendered the Offering Circular's many references to known risk that "if" occurring "might" or "could" adversely affect the Company as false and misleading.  (Emphasis added).  These so-called "risks" were already materializing before the Offering.

39.     Third, omitting the delays that were already occurring, and the impossibility to actually meet the claimed production expectations, made the Company's statements about these risks potentially materializing misleading.

40.     The Offering was successful as the Defendants placed $1.8 billion worth of the Notes.

41.     On October 6, 2017 *The Wall Street Journal* published an article titled, "Behind Tesla's Production Delays: Parts of Model 3 were Being made by Hand," detailing the reasons behind the Model 3 production delays.[3]  In particular, the article noted:

---

[3] https://www.wsj.com/articles/behind-teslas-production-delays-parts-of-model-3-were-being-made-by-hand-1507321057

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA LAW AND SECURITIES ACT OF 1933

FREMONT, Calif.— Tesla Inc. blamed "production bottlenecks" for having made only a fraction of the promised 1,500 Model 3s, the $35,000 sedan designed to propel the luxury electric-car maker into the mainstream.

Unknown to analysts, investors and the hundreds of thousands of customers who signed up to buy it, as recently *as early September major portions of the Model 3 were still being banged out by hand, away from the automated production line*, according to people familiar with the matter.

*While the car's production began in early July, the advanced assembly line Tesla has boasted of building still wasn't fully ready as of a few weeks ago, the people said. Tesla's factory workers had been piecing together parts of the cars in a special area* while the company feverishly worked to finish the machinery designed to produce Model 3's at a rate of thousands a week, the people said.

Automotive experts say it is unusual to be building large parts of a car by hand during production. "That's not how mass production vehicles are made," said Dennis Virag, a manufacturing consultant who has worked in the automotive industry for 40 years. "That's horse-and-carriage type manufacturing. That's not today's automotive world."

\* \* \*

Behind the scenes, Tesla had fallen weeks behind in finishing the manufacturing systems to build the vehicle, the people said.

*The extent of the problem came to light on Monday when Tesla said it made only 260 Model 3s during the third quarter—averaging three cars a day. The company cited production bottlenecks but didn't explain much further.*

"Although the vast majority of manufacturing subsystems at...our California car plant...are able to operate at high rate, a handful have taken longer to activate than expected," the company said at the time.

In Mr. Musk's pursuit to rid the world of combustion engines, Tesla is trying to apply Silicon Valley's ethos of rapid change to the type of complex manufacturing process that traditional auto makers have spent decades perfecting. Unusual in the U.S. tech industry, where even companies that do make hardware generally outsource their manufacturing, Tesla's challenge requires integrating an army of factory workers and some 10,000 parts from suppliers around the world.

Tesla's rollout of the Model X sport-utility vehicle in 2015 also was plagued by quality and design issues that left suppliers scrambling and hourly workers having to rush to meet lofty goals. But the plans for the Model 3 are far larger, meaning the lack of a fully working assembling line so late in production could deal a bigger blow to the company.

- 13 -

Mr. Musk has said Tesla learned from the Model X mistakes. And he has proven doubters wrong before, creating a luxury brand that competes against BMW and Mercedes-Benz for buyers and has demonstrated that fully electric cars can find an enthusiastic following beyond a niche of environmentalists.

Calling his cars a "computer on wheels," Mr. Musk caught conservative Detroit off guard with Tesla's ability to quickly change features, such as a semiautonomous drive system, with software updates over the air. The company's stock has soared about 69% in the past 12 months, at times pushing its market value past General Motors Company, Inc.

But building 500,000 vehicles a year—as Mr. Musk had projected Tesla would start doing next year—is a sizable leap for a company that only made 84,000 Model S sedans and Model X SUVs last year. By comparison, General Motors Co., the largest U.S. auto maker by sales, delivered about 10 million vehicles globally last year, or more than 27,000 a day.

*   *   *

It isn't uncommon for much larger auto makers to hand build pre-production versions of a car prior to the sales launch, but those are typically reserved for employees and others willing to test the cars and return them to the company. By the time a car goes on sale, the body shop is typically fully automated.

***Inside the Fremont factory, workers said equipment for the so-called body-in-white line for the Model 3, where the car body's sheet metal is welded together, wasn't installed until by around September. They guessed at least another month of work remained to calibrate the tools.***

***One worker who spent time in the Model 3 shop—dubbed by some as Area 51 because of the limited access and secretive nature—described watching young workers in September struggling to move large pieces of steel to weld together instead of using robots as is traditionally the case.***

***"In place of the robots…you've got two associates lining up with a big, old spot welder hanging from the ceiling by a chain, and you've got one associate kind of like balancing it and trying to get the welder in position, and you've got another welder with his arm guiding it," this worker recalled seeing. "Sparks go flying."*** In August, Mr. Musk told analysts that the Model 3s coming out of the factory were "not engineering validation units."

"They're fully certified, fully DOT-approved, EPA-approved production cars," Mr. Musk said, referring to the Department of Transportation and the Environmental Protection Agency. "These are not prototypes in any way. They're not validation anything. They are full production cars."

But he also said early versions coming out of Fremont would have issues, which is why the first cars were going to employees and investors who paid for them.

42.     On February 9, 2018, Tesla filed an 8-K "clarify[ing]" earlier comments by defendant Musk concerning the Gigafactory 1.  The Company's clarification revealed that even if Gigafactory 1 was fully running, it could still not produce the needed 5,000 batteries a week because needed equipment was still in Germany and that this equipment needed to be disassembled, shipped to the Gigafactory, and then reassembled.  In particular, the 8-K stated:

Tesla, Inc. is clarifying the following statement made by Elon Musk, Tesla's Chief Executive Officer, during Tesla's fourth quarter and full year 2017 financial results conference call held on February 7, 2018:

"[We] expect the new automated lines to arrive next month in March. And then it's already working in Germany so that's going to be disassembled, brought out to the Gigafactory and reassembled and then go into operation at the Gigafactory. It's not a question whether it works or not. It's just a question of disassembly, transport and reassembly. So we expect to alleviate that constraint. With alleviating that constraint, that's what gets us to the roughly 2,000 to 2,500 unit per week production rate."

The "2,000 to 2,500" units per week cited in this comment refers solely to the capacity of the additional automated battery module manufacturing equipment that is currently located in Germany, and not to Tesla's total Model 3 production run rate or to the capacity of the automated battery module equipment that is already present at Gigafactory 1.  Tesla's ability to meet its target of 2,500 per week by end of Q1 2018 is not dependent on the additional equipment that is currently located in Germany, as that equipment is expected to start ramping production during Q2 2018.  With respect to battery module production, Tesla's ability to meet its target of 2,500 per week by end of Q1 2018 is dependent only on the equipment that is already present at Gigafactory 1, as well as the incremental capacity that is currently being added through the semi-automated lines that were also discussed during the conference call.

As stated in Tesla's Fourth Quarter and Full Year 2017 Update Letter:

"We continue to target weekly Model 3 production rates of 2,500 by the end of Q1 and 5,000 by the end of Q2. It is important to note that while these are the levels we are focused on hitting and we have plans in place to achieve them, our prior experience on the Model 3 ramp has demonstrated the difficulty of accurately forecasting specific production rates at specific points in time. What we can say with confidence is that we are taking many actions to systematically address bottlenecks and add capacity in places like the battery module line where we have experienced constraints, and these actions should result in our production rate significantly increasing during the rest of Q1 and through Q2."

43.     In reality, Tesla knew that: (i) it could not produce 5,000 Model 3s per week; (ii) the process for building the Model 3 was still not automated; and (iii) the Gigafactory 1 was not close to being ready to mass produce enough batteries to meet the Company's needs.

44.     On October 26, 2018, *the Wall Street Journal* reported that the Federal Bureau of Investigation is examining whether Tesla misstated information about the production of its Model 3 and mislead investors about the Company's business going back to early 2017.

45.     As the market learned about these issues the value of the Notes plummeted.

## FIRST CAUSE OF ACTION

### Against All Defendants for Violation of Section 12(a)(2) of the 1933 Act

46.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

47.     This Cause of Action is brought pursuant to section 12(a)(2) of the 1933 Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against all defendants.

48.     This Cause of Action does not sound in fraud.  Plaintiff does not allege that the defendants had scienter or fraudulent intent, which are not elements of a section 12(a)(2) claim.

49.     By means of the defective Offering Circular, defendants promoted and sold the Notes to plaintiff and other members of the Class for the benefit of themselves and their associates.

50.     The Offering Circular contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above. Defendants owed plaintiff and other members of the Class who purchased or acquired the Notes pursuant to the Offering Circular, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Circular to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Circular as set forth above.

51.     Plaintiff and the other members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Offering Circular at the time plaintiff and other Class members acquired the Notes.

52.     By reason of the conduct alleged herein, defendants violated section 12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased or acquired the Notes pursuant to the Offering Circular sustained substantial damages.  Accordingly, plaintiff and the other members of the Class who hold the Notes issued pursuant to the Offering Circular have the right to rescind and recover the consideration paid for the Notes.

## SECOND CAUSE OF ACTION

### Against All Defendants for Violation of Section 15 of the 1933 Act

53.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

54.     This Cause of Action is brought pursuant to section 15 of the 1933 Act against Tesla and Musk.

55.     Musk is a controlling person of Tesla by virtue of his positions as CEO, director, then-Chairman, and senior officer of the Company. Musk is the Company's largest stockholder and the indisputable face of Tesla.  The Company's website claims that Musk is a co-founder of Tesla and oversees all product design, engineering, and manufacturing of Tesla's electric vehicles and batteries. Musk had a series of direct or indirect business or personal relationships with other directors, officers, or major stockholders of Tesla.  The Company controlled the Musk and all of Tesla's employees.

56.     Tesla and Musk were each a culpable participant in the violations of section 12(a)(2) of the 1933 Act alleged in the First Causes of Action above, based on their having authorized the issuance of the Offering Circular and having otherwise participated in the process which allowed the Offering to be successfully completed.

57.     By reason of such wrongful conduct, the defendants are liable pursuant to section 15 of the 1933 Act.  As a direct and proximate result of said wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchase or acquisition of the Notes.

## THIRD CAUSE OF ACTION

### Against All Defendants for Violation of Cal. Corp. Code §§25401. *Et Seq.*

58.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

59.     This Cause of Action does not sound in fraud.  Plaintiff does not allege that the defendants had scienter or fraudulent intent, which are not elements of a §25401 claim.

60.     Under California Corporation Code §25501, anyone that violates §25401 shall be liable to the purchaser.

61.     Under California Corporations Code §25504, every person who: (i) directly or indirectly controls a person liable under §2550; (ii) every principal executive officer or director of a corporation so liable; and (iii) every person occupying a similar status or performing similar functions, and every employee of a person so liable who materially aids in the act or transaction constituting the violation are also liable to the purchaser.

62.     Defendants offered and sold the Notes to plaintiff and the Class.  In offering and selling the Notes, defendants made written untrue statements of material fact and omitted to state material facts to plaintiff that was necessary in order to make the statement made in light of the circumstances under which they were made, not misleading, as set forth above.

63.     These misstatements and omissions were "material facts" because there was a substantial likelihood that, under all the circumstances, a reasonable investor would consider it important in reaching an investment decision.

64.     Plaintiff purchased the Notes from the Underwriting Defendants in connection with the Offering Circular that contained the untrue material facts as alleged herein.

65.     Some or all the defendants' untrue statements of material fact took place within the state of California.

66.     Tesla and Musk control the Underwriter Defendants.

67.     Musk controls Tesla.

68.     Defendants materially assisted each other in violating California Corporations Code §25401.

1        69.      Accordingly, defendants are jointly and severally liable to plaintiff and the Class for

2   the damages they suffered.

3                                    **PRAYER FOR RELIEF**

4        WHEREFORE, plaintiff prays for relief and judgment, as follows:

5        A.      Declaring this action to be a proper class action and certifying plaintiff as a Class

6   representative under section 382 of the California Code of Civil Procedure;

7        B.      Awarding compensatory damages in favor of plaintiff and the other Class

8   members against all defendants, jointly and severally, for all damages sustained as a result of

9   defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

10       C.      Awarding plaintiff and the Class reasonable costs and expenses incurred in this

11   action, including counsel fees and expert fees;

12       D.      Awarding rescission or a rescissory measure of damages; and

13       E.      Awarding such equitable/injunctive or other relief as the Court may deem just and

14   proper.

15                                     **JURY DEMAND**

16       Plaintiff demands a trial by jury.

17   Dated: November 2, 2018                 ROBBINS ARROYO LLP
                                             BRIAN J. ROBBINS
18                                           STEPHEN J. ODDO

19

20                                           _____
                                                   BRIAN J. ROBBINS
21
                                             600 B Street, Suite 1900
22                                           San Diego, CA 92101
                                             Telephone: (619) 525-3990
23                                           Facsimile : (619) 525-3991
                                             E-mail: brobbins@robbinsarroyo.com
24                                                   soddo@robbinsarroyo.com

25                                           Attorneys for Plaintiff

26

27   1303638

28

                                              - 19 -
     COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA LAW AND SECURITIES ACT OF 1933

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

TESLA, INC., ELON MUSK, GOLDMAN SACHS & COMPANY, LLC, (See Additional Parties Attachment)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

INTER-LOCAL PENSION FUND GCC/IBT, Individually and on Behalf of All Others Similarly Situated

| FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|
| E-FILED<br>11/2/2018 11:48 AM<br>Clerk of Court<br>Superior Court of CA,<br>County of Santa Clara<br>18CV337109<br>Reviewed By: R. Walker<br>Envelope: 2130985 |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Santa Clara Superior Court<br><br>191 North First Street<br>San Jose, CA 95113 | CASE NUMBER:<br>*(Número del Caso):*<br>**18CV337109** |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Brian J. Robbins, ROBBINS ARROYO LLP, 600 B Street, Suite 1900, San Diego, CA 92101; (619) 525-3990

| DATE:<br>*(Fecha)* 11/2/2018 11:48 AM   Clerk of Court | Clerk, by<br>*(Secretario)* R. Walker | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |
|---|---|---|

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Inter-Local Pension Fund GCC/IBT v. Tesla, et. al | **18CV337109** |

## INSTRUCTIONS FOR USE

➜ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➜ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

MORGAN STANLEY & COMPANY, LLC,
BARCLAYS CAPITAL, INC.,
MERRILL LYNCH, PIERCE, FENNER & SMITH INC.,
CITIGROUP GLOBAL MARKETS, INC.,
DEUTSCHE BANK SECURITIES, INC.,
RBC CAPITAL MARKETS, LLC, and
DOES 1-25, Inclusive

Defendants.

Page ___1___ of ___1___

**Page 1 of 1**

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**191 N. FIRST STREET**
**SAN JOSE, CA 95113-1090**

> **Electronically Filed**
> **by Superior Court of CA,**
> **County of Santa Clara,**
> **on 11/7/2018 9:05 AM**
> **Reviewed By: R. Walker**
> **Case #18CV337109**
> **Envelope: 2145299**

TO:    FILE COPY

RE:             **Inter-Local Pension Fund GCC/IBT v. Tesla, Inc., et al.**
CASE NUMBER:    **18CV337109**


### ORDER DEEMING CASE COMPLEX AND STAYING DISCOVERY


WHEREAS, the Complaint was filed by Plaintiff **INTER-LOCAL PENSION FUND GCC/IBT** ("Plaintiff") in the Superior Court of California, County of Santa Clara, on **November 2, 2018** and assigned to Department **1** (Complex Civil Litigation), the **Honorable Brian C. Walsh** presiding, pending a ruling on the complexity issue;

IT IS HEREBY ORDERED that:
The Court determines that the above-referenced case is **COMPLEX** within the meaning of California Rules of Court 3.400. The matter remains assigned, for all purposes, including discovery and trial, to Department **1** (Complex Civil Litigation), the **Honorable Brian C. Walsh** presiding.

The parties are directed to the Court's local rules and guidelines regarding electronic filing and to the Complex Civil Guidelines, which are available on the Court's website.

Pursuant to California Rules of Court, Rule 3.254, the creation and maintenance of the Master Service List shall be under the auspices of (1) Plaintiff **INTER-LOCAL PENSION FUND GCC/IBT**, as the first-named party in the Complaint, and (2) the first-named party in each Cross-Complaint, if any.

Pursuant to Government Code section 70616(c), each party's complex case fee is due within ten (10) calendar days of this date.

Plaintiff shall serve a copy of this Order on all parties forthwith and file a proof of service within seven (7) days of service.

Any party objecting to the complex designation must file an objection and proof of service within ten (10) days of service of this Order. Any response to the objection must be filed within seven (7) days of service of the objection. The Court will make its ruling on the submitted pleadings.

The Case Management Conference remains set for **February 15, 2019 at 10:00 a.m. in Department 1** and all counsel are ordered to attend in person.

Counsel for all parties are ordered to meet and confer in person at least 15 days prior to the First Case Management Conference and discuss the following issues:

1. Issues related to recusal or disqualification;
2. Issues of law that, if considered by the Court, may simplify or further resolution of the case, including issues regarding choice of law;

3. Appropriate alternative dispute resolution (ADR), for example, mediation, mandatory settlement conference, arbitration, mini-trial;
4. A plan for preservation of evidence and a uniform system for identification of documents throughout the course of this litigation;
5. A plan for document disclosure/production and additional discovery; which will generally be conducted under court supervision and by court order;
6. Whether it is advisable to address discovery in phases so that information needed to conduct meaningful ADR is obtained early in the case (counsel should consider whether they will stipulated to limited merits discovery in advance of certification proceedings), allowing the option to complete discovery if ADR efforts are unsuccessful;
7. Any issues involving the protection of evidence and confidentiality;
8. The handling of any potential publicity issues;

Counsel for Plaintiff is to take the lead in preparing a Joint Case Management Conference Statement to be filed 5 calendars days prior to the First Case Management Conference, and include the following:

1. A Statement as to whether additional parties are likely to be added and a proposed date by which all parties must be served;
2. Service lists identifying all primary and secondary counsel, firm names, addresses, telephone numbers, email addresses and fax numbers for all counsel;
3. A description of all discovery completed to date and any outstanding discovery as of the date of the conference;
4. Applicability and enforceability of arbitration clauses, if any;
5. A list of all related litigation pending in other courts, including Federal Court, and a brief description of any such litigation, and a statement as to whether any additional related litigation is anticipated (CRC 3.300);
6. A description of factual and legal issues – the parties should address any specific contract provisions the interpretation of which may assist in resolution of significant issues in the case;
7. The parties' tentative views on an ADR mechanism and how such mechanism might be integrated into the course of the litigation;
8. Whether discovery should be conducted in phases or limited; and if so, the order of phasing or types of limitations of discovery. If this is a class action lawsuit, the parties should address the issue of limited merits discovery in advance of class certification motions.

To the extent the parties are unable to agree on the matters to be addressed in the Joint Case Management Conference Statement, the positions of each party or of various parties should be set forth separately and attached to this report as addenda. The parties are encouraged to propose, either jointly or separately, any approaches to case management they believe will promote the fair and efficient handling of this case. The Court is particularly interested in identifying potentially dispositive or significant threshold issues the early resolution of which may assist in moving the case toward effective ADR and/or a final disposition.

**STAY ON DISCOVERY AND RESPONSIVE PLEADING DEADLINE** Pending further order of this Court, the service of discovery and the obligation to respond to any outstanding discovery is stayed. However, Defendant(s) shall file a Notice of Appearance for purposes of identification of counsel and preparation of a service list. The filing of such a Notice of Appearance shall be without prejudice to the later filing of a motion to quash to contest jurisdiction. Parties shall not file or serve responsive pleadings, including answers to the complaint, motions to strike, demurrers, motions for

change of venue and cross-complaints until a date is set at the First Case Management Conference for such filings and hearings.

This Order is issued to assist the Court and the parties in the management of this "Complex" case through the development of an orderly schedule for briefing and hearings. This Order shall not preclude the parties from continuing to informally exchange documents that may assist in their initial evaluation of the issues presented in this Case.

Plaintiff shall serve a copy of this Order on all the parties in this matter forthwith.

SO ORDERED.

Date: _11 - 5 - 18_

_____
Hon. **Brian C. Walsh**
Judge of the Superior Court

---

If you, a party represented by you, or a witness to be called on behalf of that party need an accommodation under the American with Disabilities Act, please contact the Court Administrator's office at (408) 882-2700, or use the Court's TDD line, (408) 882-2690 or the Voice/TDD California Relay Service, (800) 735-2922.

# SANTA CLARA COUNTY SUPERIOR COURT
# ALTERNATIVE DISPUTE RESOLUTION
# INFORMATION SHEET

Many cases can be resolved to the satisfaction of all parties without the necessity of traditional litigation, which can be expensive, time consuming, and stressful. The Court finds that it is in the best interests of the parties that they participate in alternatives to traditional litigation, including arbitration, mediation, neutral evaluation, special masters and referees, and settlement conferences. Therefore, all matters shall be referred to an appropriate form of Alternative Dispute Resolution (ADR) before they are set for trial, unless there is good cause to dispense with the ADR requirement.

### What is ADR?

ADR is the general term for a wide variety of dispute resolution processes that are alternatives to litigation. Types of ADR processes include mediation, arbitration, neutral evaluation, special masters and referees, and settlement conferences, among others forms.

### What are the advantages of choosing ADR instead of litigation?

ADR can have a number of advantages over litigation:

- **ADR can save time.** A dispute can be resolved in a matter of months, or even weeks, while litigation can take years.

- **ADR can save money.** Attorney's fees, court costs, and expert fees can be reduced or avoided altogether.

- **ADR provides more participation.** Parties have more opportunities with ADR to express their interests and concerns, instead of focusing exclusively on legal rights.

- **ADR provides more control and flexibility.** Parties can choose the ADR process that is most likely to bring a satisfactory resolution to their dispute.

- **ADR can reduce stress.** ADR encourages cooperation and communication, while discouraging the adversarial atmosphere of litigation. Surveys of parties who have participated in an ADR process have found much greater satisfaction than with parties who have gone through litigation.

### What are the main forms of ADR offered by the Court?

**Mediation** is an informal, confidential, flexible and non-binding process in the mediator helps the parties to understand the interests of everyone involved, and their practical and legal choices. The mediator helps the parties to communicate better, explore legal and practical settlement options, and reach an acceptable solution of the problem. The mediator does not decide the solution to the dispute; the parties do.

Mediation may be appropriate when:
- The parties want a non-adversary procedure
- The parties have a continuing business or personal relationship
- Communication problems are interfering with a resolution
- There is an emotional element involved
- The parties are interested in an injunction, consent decree, or other form of equitable relief

**Neutral evaluation**, sometimes called "Early Neutral Evaluation" or "ENE", is an informal process in which the evaluator, an experienced neutral lawyer, hears a compact presentation of both sides of the case, gives a non-binding assessment of the strengths and weaknesses on each side, and predicts the likely outcome. The evaluator can help parties to identify issues, prepare stipulations, and draft discovery plans. The parties may use the neutral's evaluation to discuss settlement.

Neutral evaluation may be appropriate when:
- The parties are far apart in their view of the law or value of the case
- The case involves a technical issue in which the evaluator has expertise
- Case planning assistance would be helpful and would save legal fees and costs
- The parties are interested in an injunction, consent decree, or other form of equitable relief

*-over-*

**ALTERNATIVE DISPUTE RESOLUTION INFORMATION SHEET
CIVIL DIVISION**

**Arbitration** is a less formal process than a trial, with no jury. The arbitrator hears the evidence and arguments of the parties and then makes a written decision. The parties can agree to binding or non-binding arbitration. In binding arbitration, the arbitrator's decision is final and completely resolves the case, without the opportunity for appeal. In non-binding arbitration, the arbitrator's decision could resolve the case, without the opportunity for appeal, unless a party timely rejects the arbitrator's decision within 30 days and requests a trial. Private arbitrators are allowed to charge for their time.

Arbitration may be appropriate when:
- The action is for personal injury, property damage, or breach of contract
- Only monetary damages are sought
- Witness testimony, under oath, needs to be evaluated
- An advisory opinion is sought from an experienced litigator (if a non-binding arbitration)

**Civil Judge ADR** allows parties to have a mediation or settlement conference with an experienced judge of the Superior Court. Mediation is an informal, confidential, flexible and non-binding process in which the judge helps the parties to understand the interests of everyone involved, and their practical and legal choices. A settlement conference is an informal process in which the judge meets with the parties or their attorneys, hears the facts of the dispute, helps identify issues to be resolved, and normally suggests a resolution that the parties may accept or use as a basis for further negotiations. The request for mediation or settlement conference may be made promptly by stipulation (agreement) upon the filing of the Civil complaint and the answer. There is no charge for this service.

Civil Judge ADR may be appropriate when:
- The parties have complex facts to review
- The case involves multiple parties and problems
- The courthouse surroundings would be helpful to the settlement process

**Special masters and referees** are neutral parties who may be appointed by the court to obtain information or to make specific fact findings that may lead to a resolution of a dispute.
Special masters and referees can be particularly effective in complex cases with a number of parties, like construction disputes.

**Settlement conferences** are informal processes in which the neutral (a judge or an experienced attorney) meets with the parties or their attorneys, hears the facts of the dispute, helps identify issues to be resolved, and normally suggests a resolution that the parties may accept or use as a basis for further negotiations.
Settlement conferences can be effective when the authority or expertise of the judge or experienced attorney may help the parties reach a resolution.

### *What kind of disputes can be resolved by ADR?*
Although some disputes must go to court, almost any dispute can be resolved through ADR. This includes disputes involving business matters; civil rights; collections; corporations; construction; consumer protection; contracts; copyrights; defamation; disabilities; discrimination; employment; environmental problems; fraud; harassment; health care; housing; insurance; intellectual property; labor; landlord/tenant; media; medical malpractice and other professional negligence; neighborhood problems; partnerships; patents; personal injury; probate; product liability; property damage; real estate; securities; sports; trade secret; and wrongful death, among other matters.

### *Where can you get assistance with selecting an appropriate form of ADR and a neutral for your case, information about ADR procedures, or answers to other questions about ADR?*

***Contact:***

Santa Clara County Superior Court
ADR Administrator
408-882-2530

Santa Clara County DRPA Coordinator
408-792-2784

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

**Complex Civil Guidelines**

*GUIDELINES AND PROTOCOLS*

*COMPLEX CIVIL LITIGATION DEPARTMENT*

Welcome to the Complex Civil Litigation Departments of the Superior Court of California, County of Santa Clara.  Ours is one of few Superior Courts selected by the California Judicial Council where case management principles designed to reduce the time and expense normally associated with complex civil litigation cases  have been employed.

Counsel's familiarity with the applicable *California Rules of Court*, *Local Rules – Superior Court of California, County of Santa Clara* and the *Deskbook on the Management of Complex Civil Litigation* is expected.  In addition, familiarity with these guidelines and protocols will answer common procedural questions and should assist you in your appearances in this Department.  ***Note:  These Guidelines and Protocols are revised from previous versions. Your thoughts and suggestions are always welcome. Significant practice highlights include:***

***The website for the Complex Departments is now integrated into the Court's site, www.scscourt.org.***

***Tentative rulings on motions of all types are posted online by 2:00 p.m. the day prior to the hearing, and, unless an objection is properly raised by 4:00 p.m. the day prior to the hearing, the ruling will automatically become the Court's order the next day.  For specific information, go to: http://www.scscourt.org/online_services/tentatives/tentative_rulings.shtml and select the appropriate department.***

***Ex parte hearings require advance reservation with the Coordinator. Letter briefs are not acceptable.***

***Case management conference statements are to be in a combined format; see VII. 3.***

***No discovery motions may be filed until the parties have meaningfully met and conferred AND met with the Court for a face-to-face Informal Discovery Conference.***

***The Court requires detailed JOINT pre-trial statements in advance of a pre-trial conference where counsel are expected to make concrete suggestions as to efficient trial management; see XI.***

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

## Complex Civil Guidelines

---

> **PLAINTIFF MUST SERVE A COPY OF THESE GUIDELINES
> WITH THE SUMMONS AND COMPLAINT.**

## TABLE OF CONTENTS

I.      CONTACT INFORMATION ................................................................. 3
II.     INTRODUCTION ............................................................................. 3
III.    COURTROOM DEMEANOR, CONDUCT AND ETIQUETTE ................... 4
IV.     GENERAL MATTERS ....................................................................... 4
V.      EX PARTE APPLICATIONS .............................................................. 5
VI.     DISCOVERY .................................................................................. 6
VII.    LAW AND MOTION ........................................................................ 6
VIII.   CASE MANAGEMENT CONFERENCE ................................................ 7
IX.     CASE MANAGEMENT AND REFERENCE ORDERS ............................. 8
X.      MANDATORY SETTLEMENT CONFERENCES (MSC) .......................... 8
XI.     MINI-TRIALS ................................................................................. 9
XII.    PRE-TRIAL CONFERENCE ............................................................... 9
XIII.   TRIALS - GENERALLY .................................................................... 13
XIV.    TRIAL EXHIBITS ............................................................................ 18
CURRICULUM VITAE FOR JUDGE BRIAN C. WALSH ............................... 20
CURRICULUM VITAE JUDGE THOMAS E. KUHNLE ................................. 22

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

## Complex Civil Guidelines

### I.  CONTACT INFORMATION

Departments 1 and 5 –      Downtown Superior Courthouse, 191 N 1st Street,
                           San Jose, CA 95113.

Department 1:

| Judge | Hon. Brian C. Walsh | 408-882-2110 |
| Courtroom Clerk | Jee Jee Vizconde | 408-882-2113 |
| Bailiff and Deputy Sheriff | Frankie Taranto | 408-882-2111 |

Department 5:

| Judge | Hon. Thomas E. Kuhnle | 408-882-2150 |
| Courtroom Clerk | Jessica Crabtree | 408-882-2153 |
| Bailiff and Deputy Sheriff | Daniel Enright | 408-882-2151 |

| Coordinator for Complex | Rowena Walker | 408-882-2286 | rwalker@scscourt.org |

E-Filing Web Site:      http://www.scscourt.org/forms_and_filing/efiling.shtml

### II.  INTRODUCTION

Complex cases suitable for assignment to the Complex Civil Litigation Department are defined in Rule 3.400, California Rules of Court ("Rules" or CRC).  Cases will be assigned to the Complex Civil Litigation Department, **for all purposes, including discovery and trial**, by the Court's own motion, or on application of any of the parties, pursuant to the procedures specified in Rule 3.400. Applications for complexity determination shall be heard in the Complex Civil Litigation Department.  It is within the Court's discretion to accept or reject a case for complex designation.

In general, cases assigned to the Complex Civil Litigation Department will be managed in accordance with the principles set forth in the *Deskbook on the Management of Complex Civil Litigation* ("Deskbook").

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

**Complex Civil Guidelines**

### III.  COURTROOM DEMEANOR, CONDUCT AND ETIQUETTE

1.   The Court expects formality, civility and proper decorum at all times.  Witnesses and parties are to be addressed and referred to by their surnames.  COURTESY AND RESPECT TOWARDS EVERYONE IN THE COURTROOM IS REQUIRED.  Advise all witnesses and parties to observe appropriate courtroom demeanor and punctuality.  The civil and courteous treatment of courtroom staff and opposing counsel is a paramount professional obligation of counsel.

2.   All pagers, cell phones and other audible electronic devices must be TURNED OFF while in the courtroom whether or not court is in session.

3.   Do not approach the clerk or reporter while court is in session for any reason.

4.   Objections, statements and arguments must be addressed to the Court rather than opposing counsel.  Counsel may speak from the lectern (if present) or the counsel table.  Counsel must stand when objecting or addressing the Court.  Counsel may approach any witnesses as necessary only with leave of Court.

5.   At the end of each day, counsel must clear work areas including the area in the rear of the courtroom.

6.   Use of the department's copier or telephone requires the Court's permission.

7.   It is counsel's responsibility to note the date and time set for any future hearing.  Hearing dates are set by contacting the Coordinator.

8.   Courtroom staff will not make copies at counsel's request unless directed to do so by the Court.  Copy work completed by courtroom staff is subject to the current per-page copy fee.

9.   If a peremptory challenge or challenge for cause is upheld, the case will be referred to the Civil Supervising Judge for reassignment.

### IV. GENERAL MATTERS

1.   The Court expects all counsel to maintain regular communication with each other regarding hearing dates, progress of the case, and settlement possibilities.  A condition of remaining in the complex department is that counsel will behave toward all counsel and other participants with

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

**Complex Civil Guidelines**

civility, courtesy and professionalism, both in and out of Court.  Meeting and conferring with opposing counsel on both procedural issues as well as substantive issues is mandated.

2.

3.   Continuances of hearing or trial dates are discouraged but may be necessary from time to time. Continuances of hearings and trial dates by stipulation are not permitted without prior approval of the Court, and only to a date pre-approved by the Court.  Please call the Coordinator for available dates before contacting other counsel.  If preliminary approval is given, a written stipulation must be provided before the hearing or trial date.  Faxed signatures on stipulations are permitted.

4.   In the event a case settles prior to a court hearing or trial date, parties must telephonically notify the Court as soon as the disposition is agreed upon and must file with the Complex Litigation Department either a Notice of Settlement, Request for Dismissal, a Stipulation for Entry of Judgment or a Judgment on Stipulation that is ready for the Court's signature.  If the applicable document is not ready, counsel must appear at the time scheduled for hearing and recite the settlement for the record.

5.   Cross-complainants must serve a copy of these guidelines upon any new parties and give notice of any scheduled hearings and depositions at the time the cross-complaint is served.

6.   All actions classified as complex or provisionally complex are subject to the Court's Electronic Filing and Service Standing Order, unless exempted by order of the Court for good cause.  Further information is posted on the Court's website at *http://www.scscourt.org/forms_and_filing/efiling.shtml* .

V.   EX PARTE APPLICATIONS

1.   Ex parte appearances are discouraged except in unusual situations. Hearing dates must be coordinated with the Complex Coordinator. Strict compliance with CRC Rules 3.1200-3.1207 is required.  In addition, the ex parte application and all supporting papers, including any proposed pleading, motion or order shall be electronically submitted to the Court's website by noon the Court day prior to the scheduled ex parte hearing date.

2.   The Court is eager to assist counsel when specific problems arise that may not require a formal motion.  To arrange a conference with the Court when all counsel agree to the advisability of such a discussion, please contact the Coordinator to reserve a time for the conference.  In these instances "letter briefs" are not acceptable, but briefs on court pleading paper not exceeding 3 pages may be submitted. The Court prefers the briefs be lodged via the Court's efiling website at

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

**Complex Civil Guidelines**

*http://www.scscourt.org/forms_and_filing/efiling.shtml* at least two court days in advance of the scheduled conference.

3.   Though the Court prefers personal appearances by counsel, counsel may appear by telephone, with the Court's prior permission, at counsel's expense.

VI. <u>DISCOVERY</u>

1.   The Court believes in open discovery in accordance with the law, but expects counsel to refrain from engaging in excessive and abusive discovery.

2.   Discovery meet and confer obligations require an in-person conference between counsel.  If a resolution is not reached, parties are required to meet and confer in person with the Court for all discovery-related hearings **prior to filing of any discovery motion, unless otherwise authorized by the Court**.  Each side must serve and lodge a short brief, **<u>limited to no more than 3 pages</u>**, two court days in advance of the meeting.  To schedule an informal discovery conference (IDC) with the Court, please contact the Coordinator.

3.   **Any dates given by the Court relating to this IDC process have no impact on statutory deadlines for filing motions or any other papers, including, but not limited to, the 45-day deadline for filing a motion to compel further responses. The party that files a discovery motion must address the motion's timeliness in its moving papers.**

VII.   <u>LAW AND MOTION</u>

1.   Law and Motion matters are generally heard Fridays at 9:00 a.m.

2.   Counsel must first clear the hearing date with the other parties prior to contacting the Coordinator.  You must provide the Court with the name of the case, the case number, type of hearing, hearing date requested and name and telephone number of the filing attorney.

3.   Prior to the hearing of **any** motion, petition or application all counsel and parties representing themselves shall communicate in a good faith effort to eliminate the necessity of the hearing.

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

## Complex Civil Guidelines

4.   **The Court values the importance of the training of the next generation of trial lawyers, which must include substantive speaking opportunities in court.  The Court strongly encourages the parties and senior attorneys to allow the participation of junior lawyers in all court proceedings, particularly in arguing motions where the junior lawyer drafted or contributed significantly to the motion or opposition.**

5.   Motions or applications to seal must be heard no later than any motion relying on the materials for which sealing is sought. Upon denial of a motion or application to seal, the moving party must notify the Court that the materials are to be filed unsealed (CRC Rule 2.551(b)(b)) or refrain from relying on the materials, which will not be part of the record.

6.   When the Court sustains a demurrer or grants a motion to strike with leave to amend and an amended pleading is filed, the plaintiff or cross-complainant shall file with its opposition to any successive demurrer or motion to strike a redline comparing the amended pleading to the previous version of the pleading.

7.   Counsel for moving parties must notify the Court as soon as possible regarding any matter to be taken off calendar or continued.  Notice of continuances of hearings must be provided by the moving party.

VIII.   <u>CASE MANAGEMENT CONFERENCE</u>

1.   The first case management conference is generally scheduled one hundred twenty (120) days after the action is filed.  Plaintiff is required to give notice of this conference date to all other parties.

2.   Case Management Conferences are generally heard Fridays at 10:00 a.m. and are scheduled as necessary to monitor the progress of the case and to assist counsel and the parties as the matter progresses.  The parties should expect the Court to schedule a status conference approximately every 120 days.

3.   Judicial Council Form CM-110, Civil Case Management Statement (required by CRC 3.725(c)), is not well-suited for complex cases. Instead, the parties shall file a joint case management statement no later than five calendar days prior to the hearing for each conference addressing the following subjects:

> (a) a brief objective summary of the case,
> (b) a summary of any orders from prior case management conferences and the progress of the parties' compliance with said orders,
> (c) significant procedural and practical problems which may likely be encountered,
> (d) suggestions for efficient management, including a proposed timeline of key events, and

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

## Complex Civil Guidelines

(e) any other special consideration to assist the Court in determining an effective case management plan.

A status conference statement may be filed as an alternative to the case management statement when appropriate.  A status conference statement is generally less detailed than a case management statement and is to be used to advise the Court of progress or developments in the case which have occurred since the last review hearing.


IX. CASE MANAGEMENT AND REFERENCE ORDERS

1.  Case Management Orders are not required in all cases, but may be helpful in cases where the sequencing and timing of key events are necessary in the management of the litigation and preparation of the case for trial.  However, even if a case management order is not necessary in a particular case, all complex cases must be managed by counsel, or the court, or both.

2.  Mediation and Reference matters should not commence until all parties are before the Court but not later than six months after the original complaint was filed, except for good cause.

3.  Mediation and Reference matters should be concluded 12 months after their initiation (approximately 18 months after the original complaint was filed), except for good cause.

4.  Brevity in drafting the Order may help focus your case and assist in reaching the desired goal (i.e., early informed resolution of your case in a cost-effective manner).

5.  After a date is scheduled with the Court, it may not be continued by stipulation of the parties without the Court's consent.


X.  MANDATORY SETTLEMENT CONFERENCES (MSC)

1.  If there is an objection to the trial judge's participation in the mandatory settlement conference, counsel must advise the Court as soon as possible, and in no event, later than the date the MSC is set. No case will be tried before a good faith effort is made to settle. Mandatory settlement conferences set on the court's calendar are typically set at the time the trial is set, and generally, the final mandatory settlement conference takes place a week to two weeks before the first day of trial, typically on a Wednesday.

2.  Trial counsel, parties and persons with full authority to settle the case must personally attend unless excused by the Court.  If insurance coverage is available to satisfy the plaintiff's settlement demand and a representative of defendant's insurer with full settlement authority attends the mandatory settlement conference with defendant's trial counsel, named defendants need not attend

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

## Complex Civil Guidelines

unless their personal consent is necessary to settle the case.  Named defendants must also personally attend the mandatory settlement conference when (a) there is an insurance coverage dispute; (b) plaintiff seeks to recover damages not covered by insurance; or (c) plaintiff's demand exceeds insurance policy limits.  Failure to appear will result in the imposition of sanctions. Settlement Conference Statements must be filed at least five (5) court days before the scheduled conference (Rule 3.1380).

3.  Any request for a waiver of the requirement to personally appear at the MSC, whether conducted by the Court or a special master, must be made by written application to the Court.


XI. <u>MINI-TRIALS</u>

There may be a pivotal issue, such as a special defense or evidentiary ruling, upon which the rest of the case depends.  If counsel agree, the Court will set aside time before or during the trial to hear mini-trials on such issues.  Time will be appropriately limited.  Briefs and factual stipulations must be submitted in advance.  Limited testimony may be taken, for example, as in an Evidence Code § 402 situation.  Contact the Coordinator to schedule a date and submit a stipulation signed by all counsel.


XII.   <u>PRE-TRIAL CONFERENCE</u>

There will be a detailed pre-trial conference 10-15 days before trial to discuss procedural issues and preliminary matters in order to make the trial process as predictable and smooth as possible.

The conference may be a time for the Court to discuss trial evidence presentation and use of audio-visual equipment. The conference is not for the purpose of hearing motions in limine.  An example of an issue for the conference:  Product liability case in which the manner of presenting the underlying case is of concern:  Will the Court allow counsel to read the transcript into the record? Live testimony?  A combination of transcript and live testimony? Is a trial by jury requested?

At least 10 days before the pretrial conference, counsel shall meet and confer and execute necessary documents listed below.  Counsel shall meet in person at a mutually agreeable time and location.

At the meet and confer, the parties shall:

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

**Complex Civil Guidelines**

1.  Prepare a **Joint Statement of the Case**.

2.  Prepare a **Joint Witness List**, excluding impeachment or rebuttal witnesses, with accurate time estimates.

Witness lists should not be exaggerated. Only witnesses that a party expects to actually call should be listed, with a brief synopsis of the proposed testimony. In addition to the list contained in the statements, each list should also be prepared in the form attached as follows. Witnesses should be listed last name first. Titles (e.g. Dr., Officer) should be placed after the comma following the last name. This is so that lists can be sorted correctly.

As noted above, Counsel should include in their witness list the amount of time they expect to spend on direct examination of each witness. The amount of time should be stated in minutes (*not* days or hours). Counsel must also be prepared to state at the conference how much time they will require for cross-examination of each witness identified on the other party's list.

At the conference the Court will make separate arrangements for the preparation of a joint list, for jury selection purposes, of possible witnesses and persons or entities who might otherwise be mentioned at trial.

 Format for Witness Lists

*Plaintiffs' List*

| Witness | Party (P or D) | Direct (min.) | Cross (min.) | Redirect (min.) | Total | Subject |
|---|---|---|---|---|---|---|
| Smith, John | P | 20 | 30 | 5 | 55 | Formation of contract |
| Brown, Nancy | P | 15 | 20 | 5 | 40 | Breach of contract |
| White, Ron | P | 70 | 10 | 15 | 95 | Damages |
| Black, Peter | P | 60 | 30 | 15 | 105 | Formation of contract |
|  | P | 120 | 100 | 30 | 250 | Damages |

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

## Complex Civil Guidelines

| | | | | | | |
|---|---|---|---|---|---|---|
| Garcia, Dr. Ruth | | | | | | |
| Rogers, Officer Ted | P | 60 | 30 | 10 | 100 | Arrest of Susan Petersen |

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

## Complex Civil Guidelines

*Defendant's List*

| Witness | Party (P or D) | Direct (min.) | Cross (min.) | Redirect (min.) | Total | Subject |
|---|---|---|---|---|---|---|
| Doe, Edward | D | 20 | 10 | 5 | 35 | Formation of contract |
| Chang, Sam | D | 75 | 30 | 15 | 120 | Damages |
| Martin, Dr. Eric | D | 120 | 60 | 30 | 210 | Damages |

3.   Exchange **exhibits** and inspect photos and diagrams (to be submitted on the date of trial), excluding those contemplated to be used for impeachment or rebuttal. **Stipulate to all facts amenable to stipulation.**

4.   Prepare a **Joint List of Controverted Issues**.  If all the parties fail to agree to an issue as controverted or uncontroverted, then the issue is controverted.  (Required for both jury and non-jury trials).

5.   Exchange all **motions** in limine.

6.   Prepare *voir dire* **questions** for the Court to include when examining the panel.

7.   Execute the **Statement of Compliance** indicating counsel has complied with the Local Rules and these Guidelines.

8.   Prepare joint proposed **jury instructions** (CACI only) and verdict forms, and exchange disputed instructions.

The above items, including opposition to motions in limine, trial briefs and the Statement of Compliance signed by all counsel, shall be submitted to the Complex Civil Litigation Coordinator or to the courtroom clerk in the department of the judge to whom the case has been assigned for trial, **no later than noon on the 1st court day before the date set for trial.**

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

## Complex Civil Guidelines

XIII.   <u>TRIALS - GENERALLY</u>

1. **General Matters – the following applies to all trials (jury and non-jury):**

   a.   Trials generally will proceed four days a week as follows:  Monday through Thursday (9:00 a.m. to 4:30 p.m.).  The Court will provide the parties, generally at the conclusion of the Mandatory Settlement Conference, a proposed trial schedule.

   b.   Jury deliberations will proceed five days a week, from 9:00 a.m. to 4:30 p.m.

   c.   Trial attorneys should be in the courtroom 30 minutes prior to the start of each morning session, unless another time is agreed upon by the Court.  Counsel should expect that the court will take appropriate action if counsel is late for any appearance and does not have a justification for a late appearance.

   d.   Before rearranging tables or other courtroom furniture, or installing equipment such as projectors or screens, permission must first be obtained from the bailiff or the Court.

   e.   Unless the Court expressly advises otherwise, counsel may not approach a witness who is testifying to hand the witness exhibits, or to help the witness locate portions thereof, without first obtaining the Court's permission.

   f.   Counsel must advise opposing counsel and the Court of the identity of each witness intended to be called by 4:30 p.m. the day preceding the time for the witness or witnesses to testify.

   g.   Counsel presenting their case shall be expected to have witnesses ready to call through at least 4:30 p.m., and may be deemed to have rested their case if they are not prepared to proceed.  Counsel shall advise the Court immediately of any circumstances which may prompt a request for a modification of the established trial schedule.

   h.   Counsel should advise the Court at the outset of the proceedings, or as soon as the issue becomes apparent, of any legal issues or evidentiary matters that counsel anticipate will require extended time for consideration or hearing outside the presence of the jury.

   i.   If during the course of trial, counsel wish to discuss a matter with the Court and opposing counsel outside of the presence of the jury, counsel MUST advise the Court of this request at the conclusion of the preceding court session and NOT immediately before proceedings are scheduled to resume.

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

## Complex Civil Guidelines

j.      The amount of jury fees required to be posted in advance of a jury trial is $150.00. CCP §631(b).  If a case settles after jury fees have been deposited, the jury fees will not be returned unless the Court is notified of the settlement by 2:00 p.m. on the court day preceding the trial date for which the deposit was made.

k.      The court reporter per diem fees in civil proceedings lasting one hour or less is $30. GC 68086(a)(1)(A). The court reporter per diem fees in civil proceedings lasting more than one hour are $350 for half-day, or $700 for full day. GC 68086(a)(1)(B).

l.      Counsel must confer in advance of the trial, attempt to stipulate on as many issues and facts as possible, and reduce all stipulations to writing. The written stipulation is filed and during jury trials is read aloud into the record.

m.      **The Court strongly encourages the parties and senior attorneys to permit junior lawyers to have an important role at trial, including the examination of witnesses.**

2. **Documents**

Unless the case was settled at the Mandatory Settlement Conference or dismissed in full prior thereto, or unless otherwise ordered by the Court, the following items must be lodged in the department of the trial judge or, if none, with the Complex Civil Coordinator, and served on all other parties by noon on the last court day before the date set for trial:

(1) all in limine motions and a list of the in limine motions;

(2) exhibit lists/indices, except impeachment exhibits;

(3) witness lists, except impeachment witnesses, and unusual scheduling problems; each witness listed shall include a succinct (no more than one or two sentences) statement of the general subject matter of the witness' testimony and an estimate of the time that will be required for the direct examination of each such witness;

(4) jury instruction requests, except for instructions that cannot reasonably be anticipated prior to trial;

(5) proposed special verdicts;

(6) any stipulations on factual or legal issues;

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

## Complex Civil Guidelines

(7) a concise, non-argumentative statement of the case to be read to the jury in jury trials;

(8) trial briefs;

(9) the original of all deposition transcripts to be used during the course of the trial. If counsel anticipates reading from the deposition transcript for any purpose other than impeachment, counsel must deliver to opposing counsel a written specification of the pages and lines proposed to be read.

An extra copy of all the above documents (except deposition transcripts) shall be delivered to the courtroom clerk on the morning of the trial for use by the clerk.

Counsel seeking to display to the jury any exhibit which required time and equipment to observe, such as slides, transparencies, movies, videotapes and audiotapes, MUST make such exhibit available to opposing counsel for review prior to commencement of the session of court at which the exhibit will be used.  Proceedings will not be delayed to permit such a review if the review has not occurred by the time court is scheduled to begin.

3.  **Technology**

Counsel must meet and confer regarding the use of computers, projectors, screens and other forms of equipment for showing evidence to the jury or Court. Counsel must confer with court staff regarding the placement and use of any such equipment.

4.  **Stipulations**

Prior to the commencement of trial, all counsel will be requested to stipulate:

1.  At the commencement of each session of the Court, all parties, attorneys and jurors are present unless otherwise indicated.

2.  After the first occasion on which the jury has been admonished not to discuss or prejudge the case in conformity with CCP § 611, the jury will be deemed to have been so admonished at every subsequent recess or separation without the need for further admonition; and

3.  Reporting of juror voir dire and jury instructions are waived.

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

## Complex Civil Guidelines

5. **Opening and Closing Arguments**

    a.    Counsel should avoid discussing routine matters of court procedure, such as the sequence of trial, in opening statements and closing arguments.  These matters will be covered by the Court and need not be repeated by counsel.

    b.    Do not display charts, diagrams or proposed exhibits to the jury until they have been shown to opposing counsel outside of the presence of the jury.  If opposing counsel indicates no objection, the exhibits or other object may be displayed to the jury without first requesting Court approval.  If opposing counsel objects, the exhibit or object may not be displayed without Court approval, which must be requested outside the presence of the jury.

6. **Examination of Witnesses**

    a.  <u>Objections:</u>  Counsel should only state the legal ground(s) of objection and, unless the Court specifically requests explanation or argument, should refrain from argument, elaboration, or any other form of extended objection-making.  Counsel may request permission to approach the side bar to present argument, but should not approach unless and until the Court grants the request.

    b.  When calling a witness to testify under Evidence Code section 776, do <u>not</u> announce in the presence of the jury that the witness being called under this provision or as a "hostile" or "adverse" witness.  Simply proceed with the examination of the witness; the Court will rule upon the applicability of section 776 only if such a ruling is required by an objection asserted by opposing counsel.

    c.  Do <u>not</u> propose a stipulation to opposing counsel in the hearing of the jury unless there is prior agreement of counsel.

7. **Transcripts**

    a.    The court reporter is under no obligation to provide transcripts of any portion of the proceedings to counsel during the course of trial.  If counsel anticipates requesting a transcript of the testimony of any witness or other proceedings during the course of

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

**Complex Civil Guidelines**

trial, arrangements should be made with the court reporter <u>in advance</u> so that arrangements can be made to obtain a second court reporter if necessary.

    b.    If counsel requests any court reporter to prepare a transcript of any portion of the proceedings, counsel MUST contemporaneously advise opposing counsel of the request and of the precise portions that will be transcribed.

8. **Jury Trials**

    a.    Motions in limine and other trial-related preliminary motions (such as Evidence Code § 402) must be submitted in writing before answering ready.  Motions in limine may be ruled on by the Court without hearing.  Such motions should be brief and should address specific subject matter. See *Amtower v. Photon Dynamics, Inc.*, (2008) 158 Cal.App.4th 1582.

    b.    CACI instructions are to be used. Submit proposed instructions in Word format.  When reasonably possible, mark up the official version rather than retyping so the changes are apparent to the Court and other counsel.  The Court may send at least 4 "clean" sets of instructions provided by counsel into the jury room.  "Clean" means just the text of the instruction, as corrected. Plaintiff has the primary, but not exclusive, responsibility to provide the "clean" sets, in binders.

    c.    Counsel should consider stipulating to fewer than 12 jurors to try the case.  They should also consider stipulating to continue with the trial with fewer than 12 jurors, should one or more be unavailable.  Counsel should be prepared to identify the number of alternates that they intend to recommend.

    d.    <u>Hardship Requests</u> - Requests by members of the panel to be excused on the ground of undue hardship will be considered by the court prior to beginning voir dire examination.

    e.    Jury selection proceeds generally under the "6 pack" method, modified to fit the case.  Court and counsel will work out the management of voir dire in accordance with CCP § 225.5 to fit the circumstances of the case.  Counsel may submit specific juror questions for the Court to consider asking during voir dire.

    f.    Voir dire examination will initially be directed to 18 or more members of the jury panel seated in the jury box.  Any of these 18 or more panel members excused for cause will be replaced by additional panel members before peremptory challenges begin.  Peremptory challenges will then proceed, directed to the first 12 panel members, who will be replaced by the next six panel members in order as any of the 12 are peremptorily challenged.  The peremptory challenges will continue until the panel seated in the jury box is reduced to 11 members, at which time additional

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

## Complex Civil Guidelines

panel members (normally an additional seven) will be selected and examined prior to resuming peremptory challenges.  Whenever there are successive passes from all parties who have not exhausted their challenges, or all parties exhaust their challenges, the jury has been selected and will be sworn.  The same process will then continue for the selection of alternate jurors.

g.      All challenges for cause will be heard out of the hearing of the jury panel.

h.      The Court will initiate voir dire examination.  Before concluding questioning, the Court will ask counsel at the side bar whether they wish the Court to address any additional questions to any or all of the panel members, and will permit counsel to examine the panel.  An appropriate time limit will be fixed by the Court.

i.      The Court preinstructs the jury once it is empaneled.  CACI Instructions relating to the basic responsibilities of the jurors, management of evidence and the like will be given and, in most cases, repeated at the close of trial.

j.      Objections of any kind are to be addressed to the Court (not to other counsel) with a concise statement of the legal grounds.  Argument on the objection without invitation by the Court is not permitted.  Advise the Court if argument is necessary for the record.

k.      Make no references to charts, models, blowups or other demonstrative evidence in front of the jury unless:  (a) it is in evidence; (b) counsel have previously stipulated the item is in evidence; or (c) you have leave of Court to use the reference.

XIV.   <u>TRIAL EXHIBITS</u>

1.      **Introduction**

a.  The electronic representations of such exhibits may be presented to the Jury/Court as substitutes for the exhibits themselves.  Counsel should keep in mind that one of the purposed of the complex project is to enhance the orderly presentation of evidence to the fact finder, and to maintain the record for potential post trial proceedings.

b.  Exhibits may be in either electronic or physical form.  Physical exhibits are not required to be presented in a digitized format.  However, at the conclusion of trial the court may order that a photo be substituted and stored electronically in lieu of the physical evidence.

c.  Parties must exchange exhibits excluding documents for bona fide impeachment at the Pre-Trial Meet and Confer.  Each counsel must provide the Court with an EXHIBIT LIST

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

## Complex Civil Guidelines

describing each exhibit, indicating whether the exhibit is to be admitted into evidence by stipulation.

d.  Counsel must submit to the Clerk original negotiable instruments for cancellation pursuant to Rule 3.1806, unless otherwise ordered by the Court.

2.  **Submission of Exhibits**

   a.  Counsel must provide the Court with the exhibits, plus one copy.  Exhibits will be marked by the Clerk, as they are identified, in chronological order.  Exhibits shall not be pre-marked by counsel.

   b.  Enlargements and transparencies normally will not be admitted into evidence.  Any large exhibit or transparency should be accompanied by an 8½ x 11 version to which the exhibit tag is attached.  Models, etc. should be photographed if proposed as exhibits.  Be sure to discuss evidentiary issues of this nature with opposing counsel.

   c.  Interrogatories and Requests for Admissions which are expected to be used at trial must be extracted and lodged with the Court, and a copy given to counsel, at the appropriate time.  In jury trials, questions and answers must be read into the record, subject to proper objections.  The extracts may be submitted as exhibits in a Court trial.  In no case will entire sets of written discovery documents be lodged or received.

   d.  Before trial commences, counsel will be asked to sign a stipulation for the return and maintenance of exhibits when the trial is completed.  Plaintiff will maintain joint exhibits, unless otherwise stipulated.

3.  **Use of Deposition Transcripts**

   a.  Deposition transcripts which are expected to be used at trial must be lodged with the Court on the first day of trial.  Pertinent provisions must be read into the record in jury trials, subject to proper objections.  In Court trials, extracts may be submitted and marked as exhibits.  In no case will an entire transcript be received.

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

## Complex Civil Guidelines

## CURRICULUM VITAE FOR JUDGE BRIAN C. WALSH

**Judge Brian C. Walsh**
**Superior Court of California**
**County of Santa Clara**
**191 North First Street**
**San Jose, California 95113**
**Department 1**
**408-882-2110**

## JUDICIAL CAREER:

**Appointed to the Superior Court December 15, 2000**
**--Elected to 6-year terms (unopposed): 2002, 2008, 2014**
**Complex Civil Litigation, 2017-**
**Presiding Judge, 2013-14**
**Assistant Presiding Judge, 2011-12**
**Civil Trials, 2003-04, 2007-09, 2011-12, 2015-16**
**Family Law, 2009-10**
**Felony Trials, 2005-07**
**Appellate Division, 2005**
**Supervisor, Misdemeanor Direct Calendars, 2002-03**
**Misdemeanor Direct Calendar, 2001**

**6th DCA, Pro Tem Justice:**
    **June 1-November 30, 2016**
    **June 1-September 30, 2015**
    **July 1-December 31, 2011**
    **May 1, 2004-January 17, 2005**

**California State-Federal Judicial Council, 2003-present**
**Language Access Plan Implementation Task Force, 2015-present**
**Chair, Trial Court Presiding Judges' Advisory Committee, 2013-2014**
**Member, Judicial Council of California, 2013-2014**
**Chair, Task Force on Trial Court Fiscal Accountability 2013-2014**
**Supreme Court Judicial Ethics Advisory Comm., 2002-2013**
**Financial Accountability & Efficiency Comm. ("A & E"), 2011-2013**
**Trial Court Budget Advisory Committee, 2013-2014**
**--Funding Methodology (WAFM) Subcommittee, 2012-2014**

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

**Complex Civil Guidelines**

**Judicial Branch Budget Advisory Committee, 2002-03**
**Chief Justice Task Force on ACA 1 (Judicial Elections), 2001**
**California Judges' Association, 2000-present**
**State Bar Attorney Civility Task force, 2006-08**
**State Bar Task Force on Support for Legal Services, 2006-08**

**2016 State Bar of California Professional Responsibility Award**
**2014 Outstanding Jurist Award, Santa Clara County Bar Association**
**2012 Trial Judge of the Year, Santa Clara County Trial Lawyers**
**2002 Salsman Award: Contributions to Community/Profession**

**EDUCATION:**

**Boalt Hall School of Law**
**University of California at Berkeley**
**J.D., 1972**

**University of Notre Dame**
**B.A., 1969**

**Date of Birth: November 11, 1947 (San Jose, California)**

Superior Court of California,
County of Santa Clara
191 North First Street
San Jose, CA 95113

Revised March 29, 2018

## Complex Civil Guidelines

**CURRICULUM VITAE JUDGE THOMAS E. KUHNLE**

**THOMAS E. KUHNLE**
**Judge**
**Superior Court of California**
**County of Santa Clara**
**191 North First Street**
**San Jose, California 95113**
**408-882-2150**

**The Honorable Thomas E. Kuhnle was appointed in December 2010 to serve as a Superior Court Judge in Santa Clara County.  His assignments have included misdemeanors in 2011, family violence from 2012 to 2014, civil trials in 2014, and probate in 2015 and 2016.  He currently serves as a complex civil litigation judge.  Since his appointment, Judge Kuhnle has participated in a number of law-related activities in our community including Santa Clara County's High School Mock Trial Program (2011-present), the Domestic Violence Council's Court Systems Committee (2012-14), Stanford Law School's Trial Advocacy Workshop (2012-present), various committees of the Santa Clara County Bar Association, and the California Judges Association Probate and Mental Health Committee (2015-2016).  Judge Kuhnle graduated from Stanford Law School in 1995.**